Filed 4/27/22 C.M. v. Superior Court CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| C.M., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF MARIN COUNTY, <br><br> Respondent; <br><br> MARIN COUNTY HEALTH AND HUMAN SERVICES, <br><br> Real Party in Interest. | A164603 <br><br> (Marin County Super. Ct. No. JV27025A) |

C.M. (Mother), mother of O.M., petitions for extraordinary relief from the juvenile court's order terminating reunification services and setting a hearing under Welfare and Institutions Code[1] section 366.26 to consider the termination of parental rights. We conclude substantial evidence supports the finding that returning O.M. to Mother's custody would create a substantial risk of detriment to the child's safety, protection, or physical or emotional well-being. We further conclude the juvenile court did not err in

---

[1]    Further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

1

refusing to continue reunification services until the 18-month review hearing. Accordingly, we deny the petition.

FACTUAL AND PROCEDURAL BACKGROUND

On November 2, 2020, real party in interest Marin County Health and Human Services (Department) received a referral that O.M. was born preterm and tested positive for methamphetamines and marijuana. Mother refused to submit to a drug test upon delivery but admitted using marijuana and methamphetamines during her pregnancy. M.W. (Father) appeared at the hospital and signed a declaration of paternity but did not provide his contact information to Mother or the hospital.

Social workers met with Mother in the neonatal intensive care unit the day after O.M.'s birth. Mother reported that she started using methamphetamines at age 14 but was clean and sober for several years before she started "using 'on and off' from 2014–2018." She admitted using methamphetamines a week before O.M.'s birth.

Mother had an extensive child welfare history involving four other children. In 2011, Mother gave birth to a baby exhibiting signs of substance withdrawal, and Mother admitted using marijuana and cigarettes during pregnancy. Though the Department found the allegation of general neglect in that instance to be inconclusive, in March 2014, the Department received a report of concern after Mother gave birth to a child who tested positive for methamphetamines. The Department offered voluntary maintenance services to the family. Shortly thereafter, in May 2014, the Department received a report that Mother had left all four of her children with relatives and nonrelative extended family members with no plans or provisions. The Department substantiated allegations of general neglect and siblings at risk, and Mother's four children were placed in legal guardianships. At the time of

2

O.M.'s birth, the Department had an open dependency case involving Mother's two eldest children who had been detained from their legal guardians in September 2020.

**A. Section 300 Petition**

On November 10, 2020, O.M. was placed into protective custody, and the Department filed a petition under section 300, subdivisions (b)(1), (g), and (j), alleging that O.M. was at substantial risk of serious physical harm or illness by Mother's inability to provide regular care due to substance abuse, and that Mother had a child welfare history with the Department involving neglect of O.M.'s four half-siblings.  The petition further alleged that Father remained absent from O.M.'s life and that his whereabouts were unknown.

On November 17, 2020, the juvenile court ordered O.M. to be detained and scheduled a jurisdiction and disposition hearing.

**B. Jurisdiction and Disposition**

In its jurisdiction and disposition report, the Department recommended that the juvenile court declare O.M. a dependent and provide Mother with family reunification services.  The Department developed a case plan for Mother that included the following service objectives: (1) build a network of people who can support her in maintaining her sobriety and managing her mental health; (2) stay free from illegal drugs, show the ability to live free from drug dependency, and comply with all required drug tests; and (3) develop coping skills to maintain her mental health.  To achieve these objectives, the case plan outlined services including counseling and mental health services, parenting education, and substance abuse services (including outpatient drug treatment and regular drug testing).

In interviews with social workers, Mother confirmed that she had not sought prenatal care during her pregnancy with O.M. because of depression.

3

She further described her long history of methamphetamine use and acknowledged she has not participated in substance treatment or achieved sustained periods of sobriety.  Mother admitted using methamphetamines in July or August 2020 and again the week before O.M's birth.[2]

In a December 2020 interview, Mother reported that her relationship with Father was "stressful and unhealthy," but that she had moved out of her apartment and was living in a "healthy, sober environment (with her boyfriend, Mr. [A.G.], and his parents)."  She identified her current support network as A.G. and his family, her sister, and her pastor.  Mother also reported that she had enrolled in an outpatient substance abuse treatment program with Bright Heart Health and submitted to random drug testing in which she tested negative for methamphetamines.  Mother continued to test positive for tetrahydrocannabinol (THC) but claimed she had not used marijuana since O.M.'s birth.

At the December 22, 2020, jurisdiction and disposition hearing, the juvenile court found the petition's allegations under section 300, subdivisions (b)(1), and (g), to be true by a preponderance of the evidence.  The court further found that clear and convincing evidence supported O.M.'s removal from Mother's custody.  (§ 361, subd. (c)(1).)  The court set a six-month review hearing for June 2021.

### C. Six-Month Review Period

After the jurisdiction and disposition hearing, Father requested a paternity test, and the test results confirmed his paternity over O.M.  The juvenile court elevated Father to presumed father status and added him to the case plan.

---

[2]    Mother also had a criminal history, with convictions in 2002 for theft, 2015 for possession of controlled substances, and 2018 for battery.

In its six-month status review report, the Department recommended continued jurisdiction over O.M., continued family reunification services to Mother, and termination of reunification services to Father.[3] The Department expressed concerns about Mother's continued marijuana use and her "fluctuations in service engagement, support network membership, and communication with the Department."

According to the report, from February to May 2021, Mother drug tested 28 times and had eight positive results for TCH and 20 "no shows." Regarding the missed tests, Mother reported being " 'too depressed to call in.' " In April 2021, Mother claimed to have not used marijuana since March 2021 and said the positive test results were due to THC still being in her system. When questioned in May 2021 about her continuing positive test results for marijuana, Mother acknowledged that she took marijuana edibles for anxiety.

Mother engaged in the Bright Heart Health outpatient treatment program in January 2021 but stopped attending in mid-February 2021. In March 2021, she enrolled in an intensive outpatient program called Positive Changes and began attending groups in April 2021. Her clinician from the program, Shani Lyons, told the Department that Mother had good attendance and participation. During a follow up conversation in May 2021, Lyons shared that Mother "has really turned a corner with regards to setting up a support network as well." However, Lyons did not know "that [Mother]

---

[3] According to the Department, Father refrained from attending visits with O.M. during the reporting period due to his continuing struggles with substance abuse. In early April 2021, Father reported that he had relapsed and planned to enter a detoxification facility, but he was arrested on April 12, 2021 and released shortly thereafter. The Department was unable to make contact with Father.

was actively using marijuana and shared she was under the impression that [Mother] was not using any substances." In May 2021, Mother began attending Narcotics Anonymous (NA) meetings.

Mother reported that she and A.G. were married in January 2021, but by March 2021, the two had separated. Mother told a social worker that she ended the relationship with A.G., and that the Department should cease all communications with him.

Communication between Mother and social workers was regular and consistent between December 2020 and late February 2021, but there were "[n]otable gaps" from late February to mid-March 2021, and from late March to late April 2021, during which Mother "continually pushed back meetings, or did not respond to attempts to reach her." When asked about these gaps, Mother said "she had been transitioning from the break up with her husband and described having a lot of 'baggage' from that." After separating from A.G. and moving into a new home, Mother reported she began working at a hauling and dumping business "with her friend, [W.S.], who she described as a new addition to her social support network."

The Department further reported that it attempted to connect Mother with mental health resources by giving her contact information for individual therapy. Mother did not connect to a mental health provider until April 2021 when she enrolled with therapist Alex Snow. Mother was also connected to psychiatry services, which were scheduled to begin in June 2021.

At the contested six-month review hearing in July 2021, the juvenile court continued family reunification services for Mother, finding she made adequate progress towards alleviating or mitigating the causes necessitating placement. As to Father however, the court found clear and convincing evidence of his failure to participate regularly and make substantive progress

6

in the court-ordered treatment plan, and accordingly, the court terminated reunification services as to him.  The court scheduled a 12-month permanency review hearing for December 2021.

### D. 12-Month Review Period

In its 12-month status report, the Department recommended that family reunification services for Mother be terminated and that the court set a section 366.26 hearing to consider termination of parental rights.  According to the Department, over the course of the 12-month review period, "there has been a pattern that has emerged.  [Mother] engages, gathers a group of supports, there is a falling out, and she drops out of communication.  Because of the continued concerns about [Mother's] unaddressed mental health symptoms, sobriety, and lack of consistent support network, the Department feels that return of the child to [Mother] would be unsafe."

From late July to early September 2021, Mother completely fell out of contact with the Department, her support persons, and her service providers.  During this time, Mother did not visit with O.M. or participate in any of her services.  The Department sent communications to Mother by mail, email, and text message but received no response.  A social worker tried unsuccessfully to reach Mother through W.S. and Mother's sister.  Mother's therapist, housing case manager, and substance abuse counselor also reported no contact with her.

Mother finally reached out to the Department on September 1, 2021, and met with a social worker at the Department's offices.  Mother, accompanied by her housing case manager Nicole Garcia, explained that she had been out of contact because she lost her phone on July 26, 2021 and had only recently reactivated her previous telephone number.  Mother said she had not reached out to anyone from her support network because there were

no payphones and she had no money to pay for transportation. "She described feeling incredibly upset having lost her phone as it was her connection to everything and her response was to 'hermit crab' in her apartment. [Mother] explained this was a result of her mental health and was a coping mechanism to deal with the stress/upset. She denied having relapsed in this meeting, although at a later date she did admit to drinking alcohol during this period."

Due to her lack of engagement, Mother was discharged from Positive Changes and dropped from Snow's caseload. After Mother resumed contact with the Department, Positive Changes insisted that she enter a detoxification facility, so she entered the Helen Vine Recovery Center for a week and then resumed her treatment through Positive Changes. Lyons credited Mother for returning to the program after relapsing, which Lyons said was "very rare."

At a Child and Family Team meeting in October 2021, Mother was accompanied by several support persons including her substance use counselor, Lyons, her new Alcoholics Anonymous (AA) sponsor Alyssa Sontag, her sister, and her housing case manager, Garcia. W.S. was not in attendance because Mother told the social worker "she had to cut him out of her life. She explained that [W.S.] was 'going through some things' and she needs healthy sober people in her life." The Department noted that "a very similar situation occurred" previously when Mother "relied heavily" on A.G. and his family, but quickly excised them from her support network after being briefly married to A.G.

In describing the new members of her support network (e.g., people from the AA community), Mother reported that she had also "reconnected" with Father after his release from jail, and that Mother had allowed him to

8

stay with her. Mother "felt there was no reason to be concerned as [Father] had been in jail, which she felt meant he would be sober, and she had only agreed to let him stay for a few days." However, both Lyons and Sontag expressed concern when informed by a social worker that Mother had reconnected with Father.

From May to October 2021, Mother consistently tested positive for marijuana. In June 2021, Mother tested positive for alcohol on three occasions, but she denied any alcohol use. In July 2021, Mother missed five out of seven drug tests, and from late July to September 1, 2021, she did not submit to any testing. After Mother resumed testing in September 2021, she missed four of 17 tests, and tested positive for marijuana until October 24, 2021 when "she tested negative for all substances for the first time." However, she again tested positive for marijuana on October 28, 2021, and missed an appointment in early November 2021.

Mother was provided with referrals for therapy, and she was eventually linked with clinician Cynthia Friedman. In November 2021, Mother attended a psychiatric appointment and was prescribed an antidepressant. Mother was also required to attend parenting classes and was provided with class information on several occasions. In October 2021, a social worker spoke with the parent coach and facilitator of the parenting class, who reported that Mother had attended one class in May 2021 but made no further contact since then.

In an addendum report filed in January 2022, the Department reported the results of 16 drug tests taken by Mother, three of which were positive for THC, three were "no shows," one test was unclear, and nine were negative for all substances. Mother continued to work with Sontag and attend AA/NA meetings, participate in treatment with Positive Changes, and engage in

therapy with Friedman. Mother attended only two parenting classes in May 2021 and January 2022. She was still spending significant time with Father.

In continuing to recommend terminating family reunification services, the Department stated: "While it is true that [Mother] is engaging with her service providers and visiting with her daughter, these are all relatively recent behavior changes. In June 2021, [Mother] was regularly testing positive for THC and Alcohol. In July 2021, [Mother] began missing appointments, missed the majority of her drug tests and missed several visits with her daughter[.] Then in August 2021, [Mother] completely disengaged from all services and contact with the Department and Service providers. She was not visiting with her daughter, she was not in treatment for her substance use, she stopped meeting with her therapist and psychiatrist, and appears to have made no efforts to make contact with the Department." The Department concluded this was not the first time this pattern has arisen in which Mother engaged "in her case plan at the last moment in an attempt to be granted more time to work towards reunification services."

### E. Permanency Review Hearing

The 12-month permanency review hearing was held over the course of several days in January and February 2022. The court admitted the Department's 12-month status report and addendum report into evidence, as well as a report by O.M.'s court appointed special advocate, who supported the Department's recommendations to terminate reunification services and set a section 366.26 hearing. Mother called several witnesses, including Pamela Meyer and Lyons from Positive Changes; Garcia; Sontag; and Labaren Terrell Jones, the house manager of a sober living program. Mother also took the stand and testified about her addiction and recovery, depression, and relationships.

10

After the conclusion of testimony and closing arguments, the juvenile court issued its decision to terminate reunification services. The court gave a lengthy and detailed explanation for its ruling. The court found that returning O.M. to Mother would create a substantial risk of detriment to O.M. due to Mother's longstanding struggles with addiction, her prior child welfare history, her "inconsistent engagement in treatment and testing with a strong indication of relapse during these dependency proceedings," and her "history of missed drug tests which as we know and which as I have advised constitute positive tests." The court noted that approximately 73 tests were ordered, of which Mother missed 43, and many were positive for marijuana, while some were positive for alcohol. In the court's view, the evidence of Mother's isolation and lack of participation in services were "all earmarks of substance abuse." Citing the two "sustained periods" during the 12-month period "of complete lack of communication or lack of engagement," the court found that it "can very well draw the logical conclusion that those constituted relapses."

Additionally, the juvenile court expressed its "lack [of] confidence . . . in the fortitude of mother's mental health." The court found that Mother's loss of her phone in July 2021 did not warrant her depression and month-long absence from services or contacts with the Department, and that it was "indicative of some other cause for the silence, such as using or indications of an unresolved mental health situation."

Mother also failed to establish a stable support network. In the court's view, Mother had "a tendency to identify individuals as very strong support and then relegate them as inadequate, inappropriate, and discard them after a short period of time." For instance, Mother "effusively" relied upon A.G. as a main support, only to separate from him less than two months after their

11

marriage. Similarly, Mother identified W.S. as a support person but later identified him as a substance abuser and excised him from her network. In the court's words, Mother's support network was "a revolving door. And when mother needed that support group in July or August of 2021, she did not avail herself of that group." Noting that Mother lived two blocks from a police station and could have walked there to call the Department, the court expressed concern "that if mother was too depressed or lacked the fortitude to make such an effort . . . over the loss of a phone, then that creates a very real visceral risk about her ability to care for an active, two-year-old child."

The juvenile court characterized Mother's engagement in services as exhibiting a "pattern . . . of fits and starts" with "almost no engagement at the beginning, and then a burst of engagement prior to six-month review" only to be followed by "questionable engagement in June and July [2021], . . . and then the complete lack of any communication or contact or engagement in August [2021]. I can't help but notice that pattern. And then, of course, another fit of engagement prior to the 12-month hearing."

The juvenile court further found no basis to continue the permanency review hearing. Emphasizing the statutory language under section 366.21, subdivision (g)(1) that a court may continue the permanency review hearing only if its finds a substantial probability the child " 'will be returned' " to the parent's custody within the extended time period, the court noted the 18-month deadline was "a scant three months away." The court concluded that Mother's progress in addressing her substance abuse problem was too slow and inconsistent to support a further continuance. In so concluding, the court found that Mother's explanations for her many missed drug tests were not credible, and that her witnesses were "by and large . . . caught flatfooted" and

12

"did not help mother's credibility," as many were unaware of the full extent of her substance abuse and child welfare history.

Finally, the juvenile court found clear and convincing evidence that reasonable services had been provided to Mother, and that there was no clear and convincing evidence a section 366.26 hearing would not be in O.M.'s best interests because she was not a proper subject for adoption. The court found, to the contrary, that O.M. was a proper subject for adoption.[4]

The juvenile court scheduled the section 366.26 hearing for June 7, 2022.

**F. Notice of Intent and Filing of Writ Petition**

Mother filed a notice of intent to file a writ petition, followed by a timely petition for writ of mandate.[5] We issued an order to show cause, and the Department filed a brief in opposition to the petition.

## DISCUSSION

At the permanency planning hearing, to be held within 12 months from the date a dependent child enters foster care, the court must determine whether the child should be returned to the custody of his or her parent or guardian. (§ 366.21, subd. (f)(1).) The child must be returned "unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment." (*Ibid.*) "Present circumstances are but one of many factors

---

[4]     Mother does not challenge the juvenile court's findings that reasonable services were provided to her or that O.M. was a proper subject for adoption.

[5]     Father also filed a notice of intent to file a writ petition but did not file a petition. Accordingly, on March 29, 2022, we issued an order dismissing the matter as to Father.

13

bearing on the question of whether returning a child to its parents would be detrimental to the child's welfare. It is for the trial court to weigh this evidence against the evidence of the parents' efforts, accomplishments, and failures during the reunification period." (*In re Jonathan R.* (1989) 211 Cal.App.3d 1214, 1221.)

"The failure of the parent . . . to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (§ 366.21, subd. (f)(1)(B).) "In making its determination, the court shall review and consider the social worker's report and recommendations and the report and recommendations of any child advocate appointed pursuant to Section 356.6; and shall consider the efforts or progress, or both, demonstrated by the parent . . . and the extent to which he or she availed himself or herself of services provided[.]" (§ 366.21, subd. (f)(1)(C).)

"We review the juvenile court's finding of detriment for substantial evidence. [Citations.] Under that standard we inquire whether the evidence, contradicted or uncontradicted, supports the court's determination. We resolve all conflicts in support of the determination, indulge in all legitimate inferences to uphold the findings and may not substitute our deductions for those of the juvenile court. [Citations.] However, '[s]ubstantial evidence is not synonymous with any evidence. [Citation.] To be substantial, the evidence must be of ponderable legal significance and must be reasonable in nature, credible, and of solid value.' " (*Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 864–865 (*Georgeanne G.*).)

Here, substantial evidence supports the juvenile court's finding of a substantial risk of detriment in returning O.M. to Mother's custody. First, there was ample evidence that Mother failed to participate regularly and

14

make substantive progress in her court-ordered treatment programs, which was prima facie evidence of detriment.  (§ 366.21, subd. (f)(1)(B).)  Regarding outpatient substance abuse treatment, Mother briefly engaged in the Bright Heart Health program from January to mid-February 2021, transitioned to Positive Changes in April 2021, and then stopped engaging entirely from late July to early September 2021.  Though Mother reengaged with Positive Changes from late September 2021 through January 2022, the juvenile court could reasonably conclude her participation and progress were not regular over the life of the case.  Indeed, as the court found, Mother's performance showed a pattern in which she had "burst[s]" of engagement in her court-ordered services prior to the review hearings, followed by periods of inconsistent or complete lack of engagement.

Mother also showed irregular participation and lack of substantive progress in drug testing.  Since February 2021, Mother tested more than 80 times and had 32 positive results for THC and 45 "no shows."  "[A] missed drug test, without adequate justification, is 'properly considered the equivalent of a positive test result.' " (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1384; *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1343 (*Jennifer A.*).)  Here, the juvenile court found that most of Mother's explanations for her missed tests were not credible, and we defer to that credibility determination.  In conjunction with the evidence of Mother's long history of substance abuse, her inconsistent engagement in substance abuse treatment and drug testing supported the finding that Mother had not made regular and substantive progress to maintain sobriety over an extended time.

There was also evidence of Mother's failure to show regular participation and substantive progress in parenting education and mental

health services. Mother attended less than a handful of parenting classes from January 2021 through February 2022. As for mental health services, Mother started individual therapy in April and May 2021 but completely disengaged from late July 2021 to early September 2021, and as a result, was dropped from Snow's caseload. Mother's extended period of isolation and depression in 2021, purportedly due to the loss of her phone, constituted particular grounds for concern that Mother had not made substantial progress in addressing her mental health issues.

Additionally, substantial evidence supports the conclusion that Mother failed to show substantive progress in her case objective to develop a stable support network. As the record reflects, Mother's support network was a "revolving door" in which she shifted from various persons and relied heavily upon certain individuals only to abruptly cut them off later. Additionally, some of Mother's most vocal support persons, such as Lyons and Sontag, appeared to have a limited understanding of the extent of her substance abuse, her child welfare history, and her case plan. Furthermore, Mother did not demonstrate an ability to use her support network during her extended period of isolation from late July to September 2021. Thus, the record amply supports the juvenile court's finding regarding Mother's failure to develop a stable support network of individuals who could help her maintain her sobriety and manage her mental health.

Mother's attempts to avoid these conclusions are unavailing. She contends she successfully eliminated the conditions that led to O.M.'s removal by remaining free from methamphetamines. She further argues the juvenile court improperly focused on Mother's use of marijuana and alcohol, as the "crux" of this case was methamphetamines. According to Mother, "[s]imply because [she] consumed kombucha or even alcohol at some point

16

over the course of over a year, or perhaps smoked marijuana once or twice on her road to recovery from marijuana as well, both legal substances, does not create a substantial risk of detriment because the nexus required is lacking. This consumption was in no way linked to Mother's parenting judgment or skills[.]"[6]

Mother's attempt to reframe the case as exclusively about methamphetamine use is unavailing, as the objective of her case plan with regard to substance abuse was to maintain sobriety and "test negative for any drugs other than prescribed medication." And Mother's characterization of her marijuana or alcohol use as minimal is an inference drawn (generously) in her favor, which is contrary to our role on substantial evidence review. (*Georgeanne G.*, *supra*, 53 Cal.App.5th at pp. 864–865.) Indulging all legitimate inferences to uphold the juvenile court's findings, as we must, we conclude the juvenile court could reasonably infer that Mother's numerous positive and missed tests demonstrated her failure to regularly participate and make substantial progress in her case plan. (*Jennifer A.*, *supra*, 117 Cal.App.4th at p. 1343.)

Mother insists it was speculative for the juvenile court to conclude that her episode of isolation in or around August 2021 was a drug relapse. (See *Georgeann G.*, *supra*, 53 Cal.App.5th at p. 869 [finding of risk of detriment must be based on more than conjecture or theoretical concern].) Mother maintains that this episode was the result not of drug use, but depression after the loss of her cell phone. But even indulging this argument, the

---

[6]    Mother testified at the permanency review hearing that she believed her positive alcohol tests were due to drinking kombucha. However, social worker Andrew Peasley testified, without objection, that he was told by laboratory staff that "given the type of test and the levels of those tests, that they could not be from Kombucha[.]"

17

incident still supported valid concerns that Mother had not made substantial progress in addressing her mental health issues. It was not unreasonable for the juvenile court to conclude there was a substantial risk of detriment to O.M. if she were returned to Mother's custody and a similar episode of depression, triggered by something as common as the loss of a phone, were to happen again.

Mother also points out that she "had completely negative tests from the end of November [2021] through February [2022], and remained free from methamphetamines for the duration of the case." From this, Mother concludes she "was able [to] overcome her addiction, and became completely sober[.]" But given Mother's history of substance abuse and her inconsistent engagement in services, the juvenile court could reasonably conclude that Mother's negative test results in the two months prior to the permanency review hearing fell short of demonstrating substantive and sustained progress towards sobriety. Rather, the court could reasonably conclude this was another demonstration of Mother's pattern of renewing her engagement in services prior to the review hearings, which was not consistent and sustained progress towards sobriety.

It is true, as Mother contends, that the goal of the dependency system is not to engineer perfect parents. A parent is "not required to demonstrate perfect compliance" in order to obtain continued reunification services. (*Jennifer A., supra,* 117 Cal.App.4th at p. 1343.) A substantial risk of detriment does not exist simply because "the parent in question is less than ideal, did not benefit from reunification services as much as we might have hoped, or seemed less capable than the available foster parent or other family member." (*M.G. v. Superior Court* (2020) 46 Cal.App.5th 646, 660.) Reasonably viewed however, the juvenile court's findings were not that

18

Mother fell short of perfection, but that she failed to show the necessary regularity and substantive progress to maintain sobriety over an extended time. Mother's reliance on *Jennifer A.* is unavailing, as the court in that case found that the mother had substantially complied with her reunification plan by completing 84 of 95 drug tests, with only one positive result. (See *Jennifer A.*, at p. 1343.) In contrast, the vast majority of Mother's drug tests were either missed or positive for substances, and thus, the juvenile court here reasonably concluded that Mother did not show substantial compliance.

Mother makes several attacks on the juvenile court's factual findings and conclusions about her witnesses. For instance, she challenges the court's characterization of her support network as a "revolving door," arguing that it was important for her to find a support system she believed in and in which she felt safe. She further contends it was error for the court to criticize her witnesses for not knowing her entire substance abuse and child welfare history, arguing that "while they may not know all about Mother's past, or why she is showing up to each meeting, it should not take away from what they *do* know of Mother." Mother contends the juvenile court was "especially harsh in calling all of Mother's witnesses 'flat-footed.' " None of these arguments is persuasive, as the weighing of evidence and assessment of witnesses are matters exclusively within the domain of the juvenile court. (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.) In any event, the court's "revolving door" remark was supported by the evidence of the constantly changing composition of Mother's support network and her unstable relationships with A.G. and W.S. And it was not unreasonable for the juvenile court to expect Mother's support persons to be better informed of her substance abuse and child welfare history in order to help her succeed in her case objective to maintain sobriety.

19

Finally, Mother asks us to direct the juvenile court to vacate its order setting the section 366.26 hearing, place O.M. with her, and order either family maintenance services, or in the alternative, additional reunification services. We decline her request.

Family maintenance services "are available to families 'whose child or children have been adjudicated a dependent of the court under Section 300, and where the court has ordered the county welfare department to supervise while the child remains in the child's home.' " (*In re Pedro Z.* (2010) 190 Cal.App.4th 12, 20, citing § 16506, subd. (a).) Thus, family maintenance services are not appropriate in a case such as this where the child has already been removed and substantial evidence supports the finding of a substantial risk of detriment in returning the child to the parent's home.

As for additional reunification services, the juvenile court already refused to extend such services beyond the 12-month review hearing, and Mother fails to show that the court's decision was in error. The juvenile court may extend reunification services "up to a maximum time period not to exceed 18 months after the date the child was originally removed from physical custody of the child's parent or guardian if it can be shown, at the hearing held pursuant to subdivision (f) of Section 366.21, that the permanent plan for the child is that the child will be returned and safely maintained in the home within the extended time period. The court shall extend the time period only if it finds that there is a substantial probability that the child will be returned to the physical custody of the child's parent or guardian within the extended time period or that reasonable services have not been provided to the parent or guardian." (§ 361.5, subd. (a)(3)(A).)[7]

---

[7] It is undisputed that reasonable services were provided to Mother. (See footnote 4, *ante*.)

Extending reunification services after the 12-month review hearing is "disfavored," and "services are available only if the juvenile court finds specifically that the parent has 'consistently and regularly contacted and visited with the child,' made 'significant progress' on the problems that led to removal, and 'demonstrated the capacity and ability both to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs.'" (*Tonya M.* (2007) 42 Cal.4th 836, 845, citing § 366.21, subd. (g)(1)(A)–(C).)

Although the Department cites a number of instances in which Mother missed supervised visits with O.M., we can accept that Mother generally maintained consistent and regular visitation with O.M. for purposes of section 366.21, subdivision (g)(1)(A). However, for the reasons already discussed, we conclude that substantial evidence supports the juvenile court's determination that Mother did not make significant progress in resolving the problems that led to O.M.'s removal, or in demonstrating the capacity and ability both to complete the objectives of her treatment plan and to provide for O.M.'s safety, protection, and physical and emotional well-being. (§ 366.21, subd. (g)(1)(B), (C).) Thus, the court could reasonably find it unlikely that O.M. would be returned to Mother by the 18-month review hearing. Accordingly, we find no error in the juvenile court's refusal to extend reunification services.

## DISPOSITION

The petition for extraordinary writ is denied. Our decision is immediately final as to this court. (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).)

                                _____

                                Fujisaki, Acting P. J.

WE CONCUR:


_____

Petrou, J.


_____

Rodrìguez, J.


A164603